**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NANCY WEST,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | |
| | : | **NO. 17-02101** |
| **NORTHAMPTON CLINIC** | : | |
| **COMPANY, LLC, and** | : | |
| **TANYA SEGAL,** | | |
| | | |
| **Defendants.** | | |

**M E M O R A N D U M**

**STENGEL, J.**                                            **August 29, 2018**

This case involves claims of disability discrimination and retaliation. Plaintiff

Nancy West was employed as a cardiothoracic physician assistant by Northampton Clinic

Company, LLC ("NCC" or the "Hospital"). Plaintiff alleges two claims against the

Hospital under the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C.

§ 12101 et seq., for discrimination and retaliation. Plaintiff also alleges a discrimination

claim under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. § 951 et

seq. In addition, plaintiff alleges that Tanya Segal violated the PHRA by aiding and

abetting discriminatory practices. Finally, plaintiff seeks punitive and liquidated damages

under the ADA.

The defendants move for summary judgment as to all four claims. (Doc. No. 18.)

Plaintiff opposed defendants' motion (Doc. No. 19) and defendants submitted a reply

(Doc. No. 22). For the reasons discussed below, defendants' motion for summary judgment is granted in full.

## I.    Background

Plaintiff began working at the Hospital on or about June 13, 2007.[1] (Compl. ¶ 7; Doc. No. 18, Ex. 1 at No. 2.) Plaintiff's job duties included evaluating patients prior to surgery, performing direct patient care, assisting during surgical procedures, independently performing surgical procedures, and interpreting diagnostic studies. (Pltff. Dep. at 92:20-97:10; Doc. No. 18, Ex. 3.) During surgery, plaintiff was responsible for positioning and draping the patient; harvesting veins prior to bypass procedures; and closing incisions made in the patient's leg and chest. Plaintiff also supervised and directed other medical personnel. (Pltff. Dep. at 152:9-155:11.) Plaintiff had a duty to remain calm and focused in high stress situations during cardiothoracic surgery. (Pltff. Dep. at 91:13-92:16.)

A third-party vendor, FMLASource, administers FMLA leave for NCC employees. (Segal Dep. at 41:17-42:11.) An employee applying for FMLA leave would communicate directly and exclusively with FMLASource regarding their medical basis for leave. (Id. at 41:17-42:11.) In May 2014, plaintiff was granted FMLA leave for post-traumatic stress syndrome relating to an assault. (Pltff. Dep. at 9:25-10:24.)

Tanya Segal began her employment as Vice President of Human resources for NCC on June 30, 2014. (Doc. No. 18, Ex. 6.) On August 15, 2014, NCC received a

---

[1] Plaintiff was first hired by NCC as a Physician Assistant on March 15, 2002 and voluntarily resigned on or about January 15, 2007. (Doc. No. 18, Ex. 1 at No. 2.) Plaintiff was rehired on June 13, 2007. (Id.)

return-to-work note from Primary Care Associates of LVPG-LVHN stating that plaintiff was "cleared . . . to return to work as of August 18, 2014, to regular duties, provided that she may attend scheduled health care appointments. She has no other restrictions." (Doc. No. 18, Ex. 5.) Ms. Segal reviewed this note, but deemed it unacceptable because it did not specify what was meant by "scheduled health care appointments." (Segal Dep. at 37:7-38:23; Doc. No. 18, Ex. 6 at ¶¶ 11, 12.) Ms. Segal requested a specification concerning whether any medical appointments could impact surgical scheduling.[2] (Doc. No. 18, Ex. 6 at ¶ 12.) In response, on August 18, 2014, NCC received an FMLA Certification of Employee's Fitness for Duty from Hope Springs Behavioral Health stating that plaintiff was cleared to return to work without restrictions. (Doc. No. 18 at 5; Segal Dep. at 49:15-20:13.)

On August 18, 2014, plaintiff resumed performing all of her duties, and believed she was capable of performing her job duties without restriction. (Pltff. Dep. at 146:1-12, 123:1-16.) Plaintiff worked without incident, both in and out of the operating room, from August 18, 2014 through November 25, 2014. (Doc. No. 18, Ex. 6 at ¶¶ 12, 13.) The Hospital employees did not say anything negative to plaintiff regarding her 2014 leave of absence. (Pltff. Dep. at 141:25-145:15.)

_____

[2] Plaintiff testified that this was discussed during an in-person meeting with Ms. Segal. (Pltff. Dep. at 113:4-114:1.) During this meeting, plaintiff testified that Ms. Segal asked "several different ways" if plaintiff was comfortable returning to work and performing her duties as a physician assistant in light of her posttraumatic stress. (Id. at 114:10-14, 119:15-20.) Plaintiff also testified that Ms. Segal "ha[d] a certain attitude of applying a stigma toward me." (Id. at 267:11-268:20.) Ms. Segal denied that this meeting took place, and testified that the first time she met plaintiff was on December 4, 2014. (Segal Dep. at 30:5-15, 50:24-51:14.)

**The November 26, 2014 Incident**

On November 26, 2014, plaintiff was scheduled to perform an endoscopic vein harvesting as part of a cardiothoracic procedure. (Pltff. Dep. at 186:3-9.) Also present for the procedure were Dr. Angelico, Registered Nurse Lory Martini, Registered Nurse Cheryl Fleming, and Certified Registered Nurse Anesthetist ("CRNA") Sue Fang. (See Ex. 1 to Segal Decl.) Plaintiff understood that it would be a challenging procedure because of the patient's medical conditions. (Id. at 186:17-24.)

As they were finishing the surgery, Dr. Angelico offered to help plaintiff close the patient, but plaintiff stated that she would do it. (Doc. No. 18, Ex. 6 at Ex. 1; Segal Dep. at 137:15-139:6.) Dr. Angelico left the operating room, at which time the surgical dressing still needed to be applied to the wound and the pacing wire needed to be replaced.[3] Plaintiff finished closing the patient's chest and then intended to apply the dressing. (Pltff. Dep. at 194:9-12.) Plaintiff testified that she was unfamiliar with the particular type of dressing that Nurse Martini provided. (Id. at 193:3-195:14.) As she was attempting to apply the dressing, Nurse Martini accused her of cutting the pacing wires and began yelling at her. (Id. at 195:15-196:1.)

Specifically, plaintiff testified,

Well, the pacing wires on the left side were cut. So in my mind I thought, the right ones are intact, he is not requiring pacing, when I'm all done here, I will put in a ground wire, which means you just put it in the skin.

. . . .

---

[3] As part of any open heart procedure, pacing wiring is attached for external pacing. (Martini Dep. at 98:20-99:6.) In this instance, the pacing wires on the left side were cut and needed to be repaired. (Pltff. Dep. at 196:2-10; Martini Dep. at 104:15-22.)

So [Nurse Martini] kept yelling at me. And, eventually, I said, Could you –I know you haven't been able to do one thing for me today but could you please do me one thing, Lor[y], Could you shut the f*** up.

And at that point she jumped from being aside of me, she went over to the phone . . . And she said, yes, I need security, I need security in O.R. 7 right now, Nancy West is in here and she is using profanity.

And at that point I thought, you know what, patient is closed up, he is stable, all the vitals are stable, everything is good, the dressing is on top of him, the suction is not working, I don't know.

Do I want to put in a pacing wire? No. I said, you know what, you are not having me arrested by security, I'm quitting today right now, bam, and I'm going to the bathroom.

I went to the bathroom. I was in there probably crying for a while, a long time. And I pulled myself together. And I thought, oh, I've got to go back in there and finish up.

(Pltff. Dep. at 196:2-197:16.)

When plaintiff returned to the operating room, she saw Dr. Angelico and Dr. Makadia working on the suction component of the surgical dressing and then left again. (Id. at 197:8-14; 206:17-20.) Plaintiff did not address the patient's severed pacing wire because she believed the patient "didn't require pacing." (Id. at 204:24-205:3.)

**Ms. Segal's Investigation**

On December 2, 2014, Ms. Segal attended a regularly-scheduled patient safety meeting. (Segal Dep. at 58:6-60:4.) Easton Hospital Chief Executive Officer John Zidansek and Chief Medical Officer Roman Tuma informed Ms. Segal that there was an incident involving plaintiff that needed to be investigated. (Id.) Mr. Zidansek directed

Ms. Segal to speak with Dr. Tuma and Medical Staff President Gregg Schubach. (Segal Dep. at 58:6-60:4.)

Dr. Tuma and Dr. Schubach informed Ms. Segal that plaintiff became agitated during a cardiothoracic surgical procedure and "refused to complete the patient's surgical dressing or address the patient's pacing wire that had been cut." (Ex. 1 to Segal Decl. at 306; see also Segal Dep. at 58:20-61:9.) They also stated that plaintiff said she was quitting and exited the operating room before completing the dressing and pacing wire. (Ex. 1 to Segal Decl. at 306.) Nurse Martini called Hospital security and immediately reported the incident to the in-house supervisor, Nurse Julie Leone. (Id.) Dr. Tuma and Dr. Schubach both advised Ms. Segal that in their opinion, plaintiff's behavior constituted patient abandonment. (Segal Dep. at 60:24-61:9; 63:10-16.)

Dr. Schubach met with the two nurses and nurse anesthetist who were present during the procedure, each of whom recorded statements regarding the incident. Nurse Fleming's statement reads as follows:

Describe the behavior you witnessed:
Nancy West became agitated during surgical dressing of patient [sic] and the discovery of a cut pacing wire—this agitation escalated into Nancy's refusal to finish surgical dressing and address cut pacing wire [sic]. Dr. Angelico called—Nancy was talking loudly using inappropriate language and states she was quitting and leaving immediately as staff present in the room ask [sic] her not to leave and abandon [patient]—she repeated that she was quitting and left the room.

Was patient care affected? If so, please describe what occurred.
Yes. Nancy West left the room without completing patient care stating she was quitting. Dr. Angelico and Dr. [Makadia] (surgical resident) then fixed pacing wire and completed the surgical dressing and assisted in safely transport [sic] the patient to the [Open Heart Recovery Unit; "OHRU"]—

twice during this time Nancy came back to door [sic] and yelling at Lor[y] and once at Cheryl.

What actions, if any, did you or any other person take at the time of the incident: Tried to calm her, remind her to care for the patient. Called Angelico, supervisor, [and] security.

(Fleming Dep. at 41:24-42:5.)

Nurse Martini's statement reads as follows:

Describe the behavior you witnessed: Nancy [West] refused to address dressing and cut pacing wire, called Dr. Angelico, Nancy screamed and said she is leaving. We asked her to finish dressing and get [patient] to the OHRU. She said she is quitting. We remind [sic] her about abandonment. She said she didn't care.

Was patient care affected? If so, please describe what occurred. Yes. [Plaintiff] refused to fix pacing wire and dressing. Dr. Angelico and Dr. [Makadia]-resident fixed wire and dressing. She came back to OR 2 times and once lunged at Cheryl and [second] time yelling at me that I was talking nice [sic] to [Dr. Makadia] while we were caring for the patient.

What actions, if any, did you or any other person take at the time of the incident: Tried to calm her down; tried to keep focus on [patient] care and safety— appropriately and timely called Dr. Angelico; nursing supervisor and Dr. [Makadia] to assist in completing [patient] care.

(Martini Dep. at 39:31040:2.)

Finally, Ms. Fang stated: "Nancy West started yelling, crying saying I am quitting[,] walked out of OR [sic]" and "Dr. Angelico [was] called in [to address patient's] dressing and [pacing] wire." (Ex. 3 to Segal Decl.)

Ms. Segal also spoke with Dr. Angelico who stated that he left the operating room after plaintiff declined his assistance in closing the patient. (Segal Dep. at 137:15-139:6.) Dr. Angelico confirmed that he was called back to the operating room to close the patient. (Id.) Dr. Angelico stated that plaintiff's behavior was "unconscionable" but that

he "felt she had some issues and needs to be rehabilitated." (Ex. 1 to Segal Decl. at NCC 306.)

On December 4, 2014, Ms. Segal met with plaintiff to address the incident. (Segal Dep. at 55:23-56:2.) Ms. Segal asked plaintiff "if [she] was feeling like [she] felt when [she] had the assault." (Pltff. Dep. at 247:18-20.) Ms. Segal asked about her use of profanity towards Nurse Martini. (Id. at 247: 18-20.)[4] Plaintiff responded that Nurse Martini was not doing her job and was not providing assistance. (Id. at 220:6-10; 221:18-22.) Plaintiff "snapped" and used profanity. (Pltff. Dep. at 224:14-226:20.) Plaintiff believed she "snapped" as a result of "maybe a combination of fatigue and other things in the posttraumatic stress [sic]." (Pltff. Dep. at 226:14-20.) At the conclusion of this meeting, Ms. Segal informed plaintiff that she was suspended with pay indefinitely. (Id. at 216:19-23.)

On December 8, 2014, as part of her investigation, Ms. Segal spoke with Charge Nurse Julie Leone, Nurse Martini, CRNA Sue Fang, and Dr. Makadia.[5] Charge Nurse Leone stated that on November 26, 2014, she was called into the operating room to "respond to an incident in which Nancy West was very agitated and yelling in the OR." (Ex. 1 to Segal Decl. at NCC 307.) When Nurse Leone arrived, she "heard Nancy saying

---

[4] Plaintiff testified that during this meeting, they only discussed the use of profanity, and that Ms. Segal never discussed the issue of patient abandonment. Ms. Segal's notes from the meeting state, "I met with Nancy today to get further information about the incident . . . I told her that I was not focusing on the inappropriate language although that is unacceptable, but I needed to understand what had happened on Wednesday 11/26/14 in the OR . . . I told Nancy that it was against Hospital policy to abandon a patient." (Ex. 1 to Segal Decl.) For purposes of this motion, I assume that plaintiff's recollection of the meeting is accurate.
[5] Ms. Segal falsely recorded that she that she also spoke with Nurse Fleming, but Nurse Fleming testified that she never spoke with Ms. Segal. (Fleming Dep. at 83:4-22.)

that she didn't care if the f-ing supervisor was called." (Id.) She also observed plaintiff throw her pager in the Open Heart Recovery Unit ("OHRU") before returning to the operating room. (Id.) Nurse Leone told Ms. Segal that plaintiff "later called her from the doctor's lounge very remorseful and said that she was sorry." (Id.)

Ms. Segal also spoke with Nurse Martini and CRNA Fang, whose statements were consistent with their written statements discussed above. Dr. Makadia did not observe the incident, but confirmed that he "was called back into the OR on 11/26/14 to help Dr. Angelico close the patient." (Id.)

Ms. Segal concluded that plaintiff abandoned the patient on November 26, 2014, warranting termination. (Segal Decl. ¶ 9.) On December 12, 2014, Ms. Segal consulted with Dr. Tuma and Mr. Zisansek who concurred in her decision to terminate plaintiff's employment. Ms. Segal informed plaintiff that her employment was terminated due to patient abandonment. (Ex. 1 to Segal Decl. at NCC 307.)

## II. Procedural History

Plaintiff commenced this action by filing a Complaint on May 8, 2017 against the defendants, Community Health Systems, Inc., Northampton Clinic Company, LLC, and Tonya Segal. (Doc. No. 1.) By stipulation, on May 18, 2017, Community Health Systems, Inc. was dismissed without prejudice. (Doc. No. 2.) On June 29, 2017, defendants filed an Answer with affirmative defenses. (Doc. No. 6.) On February 22, 2018, defendants filed a motion for summary judgment. (Doc. No. 18.) Plaintiff opposed defendants' motion (Doc. No. 19), and defendants replied (Doc. No. 22).

## III. Standard

A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials. FED. R. CIV. P. 56(c)(1)(A). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

Under Rule 56, the court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson v. Liberty Lobby, Inc., 477 U.S. at

255. The court must decide not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Id. at 252. If the non-moving party has exceeded the mere scintilla of evidence threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## IV. Discussion

Plaintiff alleges discrimination and retaliation under the ADA and PHRA. Defendants submit that they are entitled to summary judgment as to all claims. For the reasons discussed below, I find that the defendants are entitled to summary judgment and plaintiff's complaint is dismissed.

### A. Plaintiff fails to establish discrimination under the ADA

"Under the ADA, it is unlawful for an employer to discriminate 'against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." Schneider v. Works, 223 F. Supp. 3d 308, 316 (E.D.Pa. 2016) (quoting 42 U.S.C. § 12112(a)).

"Discrimination claims based on allegations of indirect discrimination are analyzed under the burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Fischer v. Pepper Hamilton LLP, 2016 WL 362507, at *14

(E.D.Pa. Jan. 29, 2016) (citing Fakete v. Aetna, Inc., 308 F.3d 335, 338 (3d Cir. 2002)). The plaintiff bears the initial burden of demonstrating a prima facie case of discrimination. Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008). The burden at this stage of the analysis is "not meant to be onerous," but "provides a sensible, orderly way to evaluate the evidence to determine whether it is adequate to create and inference of discrimination." Cellucci v. RBS Citizens, N.A., 987 F. Supp. 2d 578, 589 (E.D.Pa. 2013) (citing Furnco Const. Corp. v. Waters, 438 U.S. 567, 577 (1978) (internal quotations omitted)).

If the plaintiff demonstrates a prima facie case, then "the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action." Schneider, 223 F. Supp. at 318 (citing Makky, 541 F.3d at 214). However, "[t]he defendant does not have to show that the proffered reason actually motivated its decision for the adverse employment action." Id. (citing Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)) (emphasis in original). Lastly, if the defendant proffers a legitimate reason for the adverse employment action, "the burden shifts back to plaintiff to demonstrate that the reason is merely pretextual." Id. (citing Fuentes, 32 F.3d at 764).

1. Plaintiff fails to establish a prima facie case of discrimination.

To establish a prima facie claim of discrimination "a plaintiff must demonstrate that '(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse

employment decision as a result of discrimination.'" Schneider, 223 F. Supp. at 316 (quoting Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999)).

        a.  Plaintiff sets forth sufficient evidence to demonstrate that she is disabled.

As a threshold matter, plaintiff must establish that she is disabled under the ADA. A disability is "(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." Schirnhofer v. Premier Comp Solutions, LLC, No. 16-462, 2018 WL 1519075, at *11 (E.D.Pa. Mar. 28, 2018). A plaintiff may proceed under one or all of these categories. Id.

The Equal Employment Opportunity Commission regulations provide guidance for interpreting subsequent amendments to the ADA, which is summarized by the court in Schirnhofer:

> The term [s]ubstantially limits shall be construed broadly in favor of expansive coverage and is not meant to be a demanding standard . . . The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

2018 WL 1519075, at *11 (citing 29 CFR § 1630.2) (internal citations and quotations omitted).

The EEOC regulations also provide express guidance concerning PTSD, noting that "[g]iven their inherent nature, these types of impairments [including PTSD] will, as a factual matter, virtually always be found to impose a substantial limitation on a major life

activity . . . Therefore, . . . the necessary individualized assessment should be particularly simple and straightforward." Id. (citing 29 CFR § 1630.2(j)(3)(iii)).

Here, plaintiff's alleged impairment is PTSD stemming from an assault. Defendants argue that there is no evidence of a substantial limitation of a major life activity, hence no disability. (Doc. No. 18 at 6.) I disagree. Initially, despite defendants' acknowledgment that the ADA was amended in 2008, they apply the pre-amendment standard for determining a disability. Defendants ignore the purpose of the amendment, "to broaden the scope of disabilities covered by the ADA." Schirnhofer, 2018 WL 1519075, at *11.

Under the amended standard, plaintiff satisfies her burden of demonstrating that her PTSD constitutes a disability. Plaintiff underwent inpatient treatment in April and May 2014 for PTSD relating to her assault and continues to seek treatment. (Pltff. Dep. at 43:7-13; 45:23-46:1 11:6-10.) Plaintiff experiences flashbacks and episodes of dissociation, which she describes as being unaware of what is occurring around her. (Pltff. Dep. at 7:5-24; 39:9-12.) Plaintiff has presented evidence such that a reasonable fact-finder could conclude that she was disabled.

### b. Plaintiff is a qualified individual.

Under the second prong, "a qualified individual is '[a]n individual with a disability who, with or without reasonable accommodation, can perform essential functions of the employment position that individual holds or desires.'" Schneider, 223 F. Supp.3d at 317 (quoting Gaul v. Lucent Tech., Inc., 134 F.3d 576, 579 (3d Cir. 1998) (alteration in original)).

Here, the parties do not dispute, and the evidence supports, that plaintiff was qualified to perform the essential functions of her job as a physician assistant. I find that the second prong is satisfied.

      c.  <u>Plaintiff fails to demonstrate that she suffered an adverse employment action because of her disability.</u>

With respect to the third prong, I must determine whether plaintiff suffered an adverse employment action because of her disability. First, I will address whether plaintiff suffered an adverse employment action. Then, I will address whether plaintiff has established a causal connection between the adverse action and her alleged disability.

"An adverse employment action 'is one which alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'" <u>Fischer</u>, 2016 WL 326507, at *14 (quoting <u>Decker v. Alliant Techs., LLC</u>, 871 F. Supp. 2d 413, 428 (E.D.Pa. 2012)). Here, plaintiff was terminated, which is an adverse employment decision. See <u>Gavurnik v. Home Properties, L.P.</u>, 227 F. Supp. 3d 410, n.2 (E.D.Pa. 2017) (citing <u>Erdman v. Nationwide Ins. Co.</u>, 582 F.3d 500, 510 (3d Cir. 2009)); <u>Fischer</u>, 2016 WL 326507, at *14 ("[Plaintiff's] termination was obviously an adverse action.").

With that, whether this third prong is satisfied turns on whether plaintiff has demonstrated causation. The plaintiff must "provide evidence that supports a logical inference of causation between the alleged disability and the adverse employment action." <u>Mengel v. Reading Eagle Co.</u>, No. 11-6151, 2013 WL 1285477, at *4 (E.D.Pa.

Mar. 29, 2013) (citing <u>Yeskey v. Pa. Dept. of Corrections</u>, 118 F.3d 168 (3d Cir. 1997) <u>aff'd</u>, 524 U.S. 206 (1998)).

The following is the entire universe of facts set forth to establish a causal connection. When Ms. Segal interviewed plaintiff following the November 26 incident, she asked if the plaintiff "was feeling like [she] felt when [she] had the assault." (Pltff. Dep. at 247:18-20.) Plaintiff also argues that there were "numerous disputes of fact about the August and December encounters with Segal." (Doc. No. 19 at 17.) Taken together, plaintiff submits there is a "clear" causal connection between her disability and her termination. (Doc. No. 19 at 17.)

I disagree. I am unable to discern how this evidence supports the inference that plaintiff was terminated because of her disability. The fact that Ms. Segal allegedly inquired about plaintiff's PTSD following the incident does not disturb the undisputed fact that plaintiff abandoned a patient, which warrants termination. I am mindful that at this at this stage of the proceedings the burden is "not meant to be onerous." Nonetheless, I find that the plaintiff fails to establish an inference of discrimination sufficient to survive summary judgment.

In conclusion, plaintiff failed to establish a prima facie case of disability discrimination, and summary judgment is granted as to this claim. <u>Fischer</u>, 2016 WL 362507, at *15. Notwithstanding the plaintiff's failure to demonstrate a prima facie case, I will address the remaining portions of the analysis for completeness.

2. <u>The Hospital articulates a legitimate, non-discriminatory reason for plaintiff's termination.</u>

Assuming arguendo that plaintiff demonstrated a prima facie case of discrimination, the burden shifts to the defendants to articulate a legitimate, non-discriminatory reason for her termination. As discussed above, the Hospital's given reason for terminating plaintiff was because she abandoned a patient during a cardiothoracic procedure. Nurse Martini and Nurse Fleming prepared contemporaneous written statements describing their first-hand accounts of the incident, including that plaintiff left the operating room before completing the surgical dressing or pacing wire placement.[6] Even plaintiff testified that after she left the operating room, she thought, "oh, I've got to go back in there and finish up." (Pltff. Dep at 197:9-11.) Dr. Angelico and Dr. Makadia were called back into the operating room to complete the procedure, a fact that is also undisputed. Following a thorough investigation, discussed <u>supra</u>, Ms. Segal concluded that plaintiff's behavior constituted patient abandonment warranting termination.

I find that the Hospital has clearly met its "relatively light" burden of demonstrating a legitimate, non-discriminatory reason for plaintiff's termination. <u>Fuentes</u>, 32 F.3d at 763. Under the <u>McDonnell</u> burden-shifting framework, the "burden rebounds to the plaintiff, who must show by a preponderance of the evidence that the employer's explanation is pretextual." <u>Id.</u>

---

[6] Ms. Segal also spoke with CRNA Sue Fang, whose recollection was consistent with that of Nurse Fleming and Nurse Martini.

3. <u>Plaintiff fails to demonstrate that the Hospital's reason for her termination was pretextual.</u>

To overcome a motion for summary judgment, a plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve [Defendant's] articulated legitimate reason []; or (2) believe that an invidious reason was more likely than not a motivating or determinative cause of [Defendant's] action." <u>Fuentes</u>, 32 F.3d at 764. The plaintiff must produce evidence demonstrating that the employer's proffered legitimate reason "was either a <u>post hoc</u> fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." <u>Id.</u>

        a. <u>Plaintiff points to no evidence that would permit a reasonable factfinder to disbelieve the Hospital's legitimate reason for terminating plaintiff.</u>

With respect to the first way to show pretext, "the plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence . . . ." <u>Brown v. Vanguard Group, Inc.</u>, No. 16-946, 2017 WL 412802 (E.D.Pa. Jan. 30, 2017) (citing <u>Fuentes</u>, 32 F.3d at 765). The Court's inquiry should not focus on "'whether the employer made the best, or even a sound business decision; [but] whether the real reason is [discrimination].'" <u>Schneider</u>, 223 F. Supp. 3d at 318-19 (quoting <u>Keller v. Orix Credit All., Inc.</u>, 130 F.3d 1101, 1109 (3d Cir. 1997)) (alteration in original).

Without reference to this standard, plaintiff essentially argues that Ms. Segal's testimony is inconsistent and is not entitled to any weight. More specifically, plaintiff argues that Ms. Segal demonstrated animus towards her when she attempted to return to work in August of 2014, and that the termination decision was based on Ms. Segal's false statements. For instance, Ms. Segal reported that she met with Nurse Fleming as part of her investigation, a fact Nurse Fleming later denied at her deposition. Likewise, plaintiff points to an email Ms. Segal sent to the Regional Human Resources Director, Bruce Hamilton. In this email, Ms. Segal advised Mr. Hamilton of the decision to terminate plaintiff stating, in part "[w]e've had issues with her in the past." At her deposition, Ms. Segal admitted that there were no prior incidents of misconduct. However, Ms. Segal also testified that Dr. Tuma told her there was disruptive behavior in the past and she relied on this statement. There are also inconsistencies between Ms. Segal's testimony and plaintiff's testimony. As an example, Ms. Segal denied meeting with plaintiff in August of 2014 when plaintiff attempted to return to work. These inconsistencies, plaintiff argues, demonstrate that the decision to terminate plaintiff was based on Ms. Segal's false statements. This argument misses the mark.

Plaintiff is correct that there are inconsistencies in Ms. Segal's testimony. However, these inconsistencies are immaterial and do not disturb the undisputed fact that during a surgical procedure plaintiff said "I quit," and left the operating room. As discussed above, the overwhelming evidence including witness statements, contemporaneous records, and the plaintiff's own testimony, establishes that plaintiff exited the operating room before the procedure was complete. Dr. Tuma and Dr.

Schubach both concluded that plaintiff's behavior constituted patient abandonment (Segal Dep. at 60:24-61:6; 63:10-16), and Dr. Angelico described plaintiff's behavior as "unconscionable." (Ex. 1 to Segal Decl. at NCC 306.) Plaintiff has failed to set forth any evidence from which a reasonable fact-finder would disbelieve the Hospital's legitimate reason for terminating plaintiff based on these uncontested facts.[7]

What is more, there is no evidence of a pattern of antagonism that would establish an inference of discrimination. As discussed more fully above, Plaintiff immediately resumed work on August 18, 2014 in her regular capacity without any restrictions. Plaintiff worked without incident until November 25, 2014 and no employee of NCC ever said anything negative to plaintiff regarding her leave of absence. Plaintiff failed to set forth any evidence that would permit a factfinder to disbelieve the hospital's legitimate reason for terminating plaintiff.

     b. <u>Plaintiff points to no evidence that a reasonable factfinder could determine that an invidious reason was more likely than not a motivating or determinative cause of plaintiff's termination.</u>

Plaintiff fails to demonstrate pretext under the second option: showing that an invidious reason was more likely than not a motivating cause of plaintiff's termination. The Court must determine "whether the employer gave an honest explanation of its behavior that is not discriminatory." <u>Schneider</u>, 223 F. Supp. 3d at 320 (citing <u>Brewer v.</u>

---

[7] Plaintiff also argues that the fact that the hospital did not report the alleged patient abandonment to the Patient Safety Authority pursuant to 40 P.S. 1303.313(b) discredits the Hospital's reason for terminating plaintiff. I disagree. Plaintiff failed to point to any evidence that the Hospital was previously confronted with a similar situation of patient abandonment and handled it differently. Absent such evidence, plaintiff is unable to demonstrate that the Hospital's reason for termination was pretext for discrimination.

Quaker State Oil Ref. Corp., 72 F.3d 326, 332 (3d Cir. 1995) (internal citations omitted).

A plaintiff can demonstrate pretext under this approach by setting forth evidence that:

> (1) Defendants previously discriminated against Plaintiff; (2) Defendants discriminated against others within Plaintiff's protected class; or (3) Defendants treated similarly situated individuals more favorably.

Brown, 2017 WL 412802, at *14 (citing Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 645 (3d Cir. 2015)).

The record is devoid of evidence demonstrating that the Hospital was motivated by an invidious reason. Plaintiff argues that Ms. Segal demonstrated animus towards her when she attempted to return to work. Specifically, Ms. Segal asked plaintiff why she had been on short term disability and had a discussion about PTSD. (Pltff. Dep. at 114:10-20; 267:11-268:20.) I find that this statement, without more, does not demonstrate Ms. Segal's animus towards plaintiff or individuals with PTSD.[8]

Therefore, plaintiff failed to establish that the Hospital's legitimate non-discriminatory reason for her termination was a pretext for some other discriminatory motive. For the reasons set forth above, I will grant the defendants' motion for summary judgment on disability discrimination.

## B. Plaintiff concedes her retaliation claim

Despite the fact that the complaint includes a retaliation claim, plaintiff herself concedes that this "is not a case of retaliation for making complaints of discrimination." (Doc. No. 19 at 9.) I agree. None of the facts discussed above establish

---

[8] There is also no evidence that that the Hospital discriminated against other employees with PTSD or that it treated similarly situated employees more favorably.

retaliation because of disability and/or medical leave, and I will grant summary

judgement as to retaliation.

The ADA states that

[n]o person shall discriminate against any individual because such
individual has opposed any act or practice made unlawful by this chapter or
because such individual made a charge, testified, assisted, or participated in
any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a).

ADA retaliation claims follow the same McDonnell burden-shifting framework

discussed above. Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 187 (3d Cir.

2003) (citing McDonnell, 411 U.S. at 93). To establish a prima facie case of ADA

retaliation, a plaintiff must establish (1) her engagement in a "protected employee

activity," (2) "adverse action" by the employer, and (3) "a causal connection between the

employee's protected activity and the employer's adverse action." EEOC v. Allstate

Insurance Co., 778 F.3d 444, 449 (3d Cir. 2015); Krouse v. Am. Sterilizer Co., 126 F.3d

494, 500 (3d Cir.1997).[9]

1. Plaintiff does not establish a prima facie case of retaliation.

At the outset, the alleged "protected employee activity" is unclear based on the

evidence and the plaintiff's briefing. If that protected activity is plaintiff's request for

medical leave, then this prima facie case fails for the same reasons discussed above—

---

[9] If the plaintiff establishes these elements, "the burden shifts to the employer to advance a
legitimate, non-retaliatory reason for its adverse employment action." Shellenberger, 318 F.3d at
187 (citing Krouse, 126 F.3d at 500). "If the employer satisfies that burden, the plaintiff must
then prove that 'retaliatory animus played a role in the employer's decisionmaking [sic] process
and that it had a determinative effect on the outcome of that process.'" Id. (citing Krouse, 126
F.3d at 501).

because plaintiff fails to demonstrate a causal connection between the protected activity and her termination. If the protected activity is plaintiff's alleged request for an accommodation during her December 4 meeting with Ms. Segal,[10] plaintiff still fails to meet her prima facie burden. I will briefly address plaintiff's retaliation claim stemming from this meeting.

A retaliation claim requires "a causal link between the protected activity and the adverse employment action." Schneider, 233 F. Supp. at 321. The court considers a "broad array of evidence to determine causation, including temporal proximity, intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." Gavurnik, 227 F. Supp. 3d at 420-21(citing LeBoon v. Lancaster Jewish Cmty. Cty. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007)) (internal quotations omitted). Temporal proximity is measured "from the date on which the litigant engaged in [her] first protect[ed] action." Gairloch v. Pennsylvania State University, 84 F. Supp. 3d 407, 418 (M.D.Pa. 2015).

Plaintiff's first protected action occurred when she returned from medical leave in August 2014, and she was terminated three and a half months later on December 4, 2014. This temporal proximity is not "unduly suggestive" of discrimination. Blakney v. City of

---

[10] Plaintiff's complaint alleges that "[u]pon learning of her suspension . . . [she] reported and complained to Segal that she was over-worked and was having trouble coping with the work due to her disabilities [and] specifically advised that the workload was unsustainable given her disabilities, and thus requested accommodation under the ADA." (Compl. at ¶ 41.) Despite the fact that the record does not support plaintiff's allegation that she requested an accommodation during this meeting, (Pltff. Dep. at 213:13-228:18), I will assume that this constitutes a protected activity and that plaintiff's termination constituted an adverse employment action.

<u>Philadelphia</u>, 559 Fed. Appx. 183, 186 (3d Cir. 2014) (reasoning that "a temporal proximity of two days is unusually suggestive of causation . . . but . . . a temporal proximity greater than ten days requires supplementary evidence of retaliatory motives."); <u>LeBoon</u>, 503 F.3d at 233 (three months is not unusually suggestive). Likewise, as discussed above, there is no evidence of antagonistic behavior on the part of the Hospital or any evidence that would support an inference of retaliatory animus. I find further support for my conclusion in Hospital's compelling reason for plaintiff's termination: that she abandoned a patient during a surgical procedure, a fact that is undisputed.

Viewing the facts in the light most favorable to the plaintiff, I find that plaintiff failed to demonstrate that her termination was causally related to the protected activity. Therefore, plaintiff is unable to demonstrate prima facie retaliation, and I will grant summary judgment on this claim.[11]

## C. Summary judgment is granted as to plaintiff's PHRA claims.

Defendants argue, and plaintiff does not dispute, that summary judgment is warranted on plaintiff's PHRA claims. It is well-established that "since Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts, analysis of an ADA claim applies equally to a PHRA claim." <u>Solomon v. School Dist. of Philadelphia</u>, 88 F. Supp. 2d 766, 776 (E.D.Pa. 2012) (internal citations and quotations omitted.)

---

[11] Even if plaintiff satisfied her burden of demonstrating a <u>prima facie</u> case of retaliation, for the same reasons discussed above in section (A), plaintiff's retaliation claim must fail as a matter of law because the defendants articulated a legitimate non-discriminatory reason for terminating plaintiff, and plaintiff failed to demonstrate pretext.

Therefore, in line with my ADA analysis above, the Hospital is entitled to summary judgment on plaintiff's PHRA claims.

Plaintiff's PHRA claim against Ms. Segal, individually, also fails. Section 955(e) of the PHRA prohibits "any person . . . to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice." 43 PA. STAT. ANN. § 955(e); Arnold v. AutoZone, Inc., No. 13-1329, 2016 WL 807805 (E.D.Pa. Mar. 2, 2016). It is well-established that "[i]f the employer is not liable for any discriminatory practice then an individual employee cannot be held liable for aiding and abetting a discriminatory practice." Arnold, 2016 WL 807805, at *41 (citations omitted).

Because I find that the Hospital is not liable for discrimination or retaliation under the ADA or the PHRA, I must also find that Ms. Segal is not liable. Therefore, I will grant summary judgment on the plaintiff's PHRA claims.

## V.     Conclusion

There is no genuine dispute as to any material fact concerning plaintiff's discrimination and retaliation claims under the ADA and PHRA. Summary judgment is granted.

An appropriate order follows.